## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY LOU PHILLIPS, | |
| Plaintiff, | CIVIL ACTION NO. 3:15-CV-00563 |
| v. | |
| THE CENTER FOR VISION LOSS, et al., | (MEHALCHICK, M.J.) |
| Defendants. | |

### MEMORANDUM

This is an employment discrimination and retaliation civil rights action seeking compensatory and punitive damages, initiated by the filing of a counseled complaint in this matter by Plaintiff Mary Lou Phillips on March 20, 2015. (Doc. 1). In her complaint, Plaintiff asserts violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951-963, against The Center for Vision Loss (the "Center"); the Center's branch manager and Plaintiff's former supervisor Cynthia Starner; the Center's executive director Doug Yingling; and the individual members of the Center's personnel committee: Brad Ott, David Pike, Stephanie Olexa, Tim Fox, and Tony Swartz. (Doc. 1, ¶¶ 2, 23, 29, 34). After engaging in limited discovery, the parties agreed to dismiss Ott, Pike, Olexa, Fox, and Swartz from this action with prejudice. (Doc. 19). Presently pending before the Court is a motion for summary judgment filed by the three remaining Defendants: the Center, Starner, and Yingling. (Doc. 21). For the reasons stated herein, the Court will grant in part and deny in part Defendants' motion for summary judgment.

I. **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The relevant facts are presented in the light most favorable to Plaintiff, the non-moving party. Plaintiff began working as a receptionist at the Center in December of 2009, after a merger between the Center and her previous employer. (Doc. 21-1, ¶¶ 1-2; Doc. 23, ¶¶ 1-2). In addition to being employed by the Center, Plaintiff was also a client there. (Doc. 1, ¶ 22; Doc. 23, ¶ 36). Thus, the Center knew that Plaintiff had significant vision loss in that she was completely blind in one eye and had reduced vision in the other eye. (Doc. 21-1, ¶ 5; Doc. 23, ¶ 5). Starner, as the manager of the Center's one-room Monroe County office, supervised Plaintiff throughout Plaintiff's employment with the Center.[1] (Doc. 21-1, ¶¶ 2, 4; Doc. 23, ¶¶ 2, 4). Plaintiff's duties at the center included answering telephones and scheduling drivers to arrange rides for visually-impaired clients. (Doc. 21-1, ¶ 3; Doc. 23, ¶¶ 3, 102). Because Plaintiff had difficulty reading due to her vision loss, Defendants attempted to accommodate her by providing "Zoomtext," a software program that enlarged and read aloud computer text. (Doc. 21-1, ¶ 6; Doc. 23, ¶¶ 6, 45, 101, 103). However, Plaintiff states that she did not utilize the "read aloud" feature of Zoomtext because it distracted her coworkers. (Doc. 21-1, ¶ 6; Doc. 23, ¶¶ 6, 103).

During the first few years of her employment with the Center and dating back to her time with her previous employer, Plaintiff consistently received "average" and "above average" performance evaluations, with Starner even commenting in 2009 that Plaintiff was "a valuable assert to [the] organization." (Doc. 23, ¶ 89; Doc. 23-10). Nonetheless, Starner asserts in her

---

[1] The Center had a second location in the Lehigh Valley. (Doc. 21-1, ¶ 4; Doc. 23, ¶ 4).

deposition testimony that Plaintiff was never a competent employee and that her work was "marginally acceptable." (Doc. 23, ¶¶ 74, 88; Doc. 21-3, at 34; Doc. 23-9, at 2). Specifically, Starner claimed that Plaintiff only obtained and kept her job because Plaintiff's husband, Robert Phillips, was a member of the Center's board of directors. (Doc. 23, ¶ 88; Doc. 23-9, at 2).

In the spring of 2013, Plaintiff's work product and overall demeanor significantly deteriorated. (Doc. 21-1, ¶ 7; Doc. 23, ¶ 7). Clients and coworkers complained that Plaintiff mishandled drivers' schedules, delayed or ignored requests for appointment changes, and failed to forward customer messages. (Doc. 21-1, ¶ 16; Doc. 21-3, at 33-34; Doc. 23, ¶ 16). Plaintiff also fell asleep at her desk, and on one occasion during the spring of 2013 slept through a meeting. (Doc. 21-1, ¶¶ 14-15; Doc. 23, ¶¶ 14-15). Moreover, Plaintiff openly complained about her job, her marital situation, and Starner—even declaring that Starner could not manage herself out of a paper bag. (Doc. 21-1, ¶¶ 11-13, 17; Doc. 21-2, at 24; Doc. 23, ¶¶ 11-13, 17). Starner alleges that the situation became so untenable that three coworkers threatened to quit due to Plaintiff's behavior. (Doc. 21-1, ¶ 18; Doc. 21-3, at 39; Doc. 23, ¶ 18).

Plaintiff admits that her attitude and work product were poor during the spring of 2013, but stresses that these behavioral changes were medically related, as Plaintiff has been diagnosed with bipolar disorder in the early 2000s. (Doc. 23, ¶¶ 7, 10). Moreover, Plaintiff claims that Starner and other Center employees perceived that Plaintiff's behavioral changes in the spring of 2013 were due to some sort of medical condition. (Doc. 23, ¶¶ 7, 10, 16-18, 73). While Defendants state that they attributed Plaintiff's behavioral changes to marital difficulties, there is evidence in the record to suggest that Starner knew that Plaintiff had mental health problems well before the spring of 2013. (Doc. 21-1, ¶ 8; Doc. 23, ¶¶ 8-9, 18, 39, 63-66, 91, 106-

- 3 -

07, 116). For instance, Robert Phillips asserts in his deposition testimony that he informed Starner that Plaintiff was bipolar years earlier when Starner first contacted him to complain that Plaintiff fell asleep at work. (Doc. 23, ¶¶ 9, 63, 91, 107; Doc. 23-1, at 20-22). Robert Phillips also asserts that he explained to Starner at that time that Plaintiff had to take a certain type of medication that made her drowsy. (Doc. 23, ¶¶ 14, 63, 66, 91, 107; Doc. 23-1, at 20-21). Plaintiff and Robert Phillips further claim that Starner was the one who referred Plaintiff to her current psychologist, Dr. Vanmeter. (Doc. 21-2, at 14; Doc. 23, ¶¶ 9, 106; Doc. 23-1, at 21). Furthermore, Plaintiff state that Starner's own comments reveal that she was aware of Plaintiff's medical conditions. For instance, on one occasion Starner is alleged to have sarcastically referred to Plaintiff in front of her coworkers as "Ms. Visually Impaired." (Doc. 21-2, at 11-12; Doc. 23, ¶ 115). Plaintiff also alleges that Starner questioned Plaintiff as to whether her medications were in order. (Doc. 21-4, at 38; Doc. 23, ¶¶ 18, 39, 116).

On April 15, 2013, Starner and Plaintiff met to discuss Plaintiff's behavior. (Doc. 21-1, ¶ 20; Doc. 23, ¶ 20). At the meeting, Starner complained that Plaintiff's handwriting was illegible when she transcribed drivers' schedules into the Center's scheduling book. (Doc. 21-1, ¶ 20; Doc. 23, ¶ 20). Plaintiff states that she had difficulty scheduling appointments in the book while on the phone with customers because she was simultaneously required to hold the phone and a magnifier while writing the appointment information into the small space that was provided in an appointment book. (Doc. 23, ¶ 110). As a potential solution, Plaintiff suggested that she be provided the Sharepoint software program, which was used by the Center's employees at the Lehigh Valley location to schedule driver pickups. (Doc. 21-2, at 25; Doc. 23, ¶¶ 81, 111-12). Starner appeared receptive to the idea of using Sharepoint, and made additional changes to the

driver scheduling process in an effort to avoid future communications breakdowns. (Doc. 21-2, at 48-50; Doc. 23, ¶ 108). However, Plaintiff was unable to figure out how to use Sharepoint on her own and although Starner allegedly promised to train Plaintiff how to use the program, Starner never got around to doing so. (Doc. 21-2, at 25; Doc. 23, ¶¶ 82, 109). The April 15, 2013 meeting and Starner's subsequent notes from that meeting was the first time that Starner documented any concerns about Plaintiff's performance, despite the fact that Starner stated in her deposition testimony that it was her practice to document major concerns about an employee's performance. (Doc. 21-3, at 25-29, 52-53; Doc. 23, ¶¶ 68-70, 85).

Also during the meeting, Plaintiff requested to take a week-long vacation later that month to visit her granddaughter in Florida. (Doc. 21-1, ¶ 21; Doc. 21-2, at 10; Doc. 23, ¶ 21). Starner expressed her frustration with the short notice given for this request because Plaintiff knew that Starner was scheduled to be out of the office and recovering from surgery at that time. (Doc. 21-1, ¶ 22; Doc. 21-2, at 49; Doc. 23, ¶¶ 22, 77). Starner then asked Plaintiff to consider postponing the trip, and said she would consult the Center's employee manual to determine whether Plaintiff gave sufficient notice for her vacation request. (Doc. 21-2, at 49; Doc. 21-3, at 36-37; Doc. 23, ¶¶ 78, 113). Frustrated with what she considered to be unfair treatment from Starner, Plaintiff cancelled her vacation plans. (Doc. 21-2, at 10; Doc. 23, ¶¶ 23, 114). Sometime thereafter, Starner informed Plaintiff that she could take the vacation time, but Plaintiff had already cancelled the trip.[2] (Doc. 21-1, ¶ 23; Doc. 21-2, at 10; Doc. 23, ¶¶ 23, 114).

_____

[2] The parties dispute how long it took Starner to respond to Plaintiff's request for vacation time. Although Starner alleges that she got back to Plaintiff within a matter of

On April 22, 2013, one week after their first meeting, Plaintiff and Starner met with Yingling, the Center's executive director and Starner's direct supervisor. (Doc. 21-1, ¶ 24; Doc. 21-2, at 21; Doc. 21-3, at 38-41; Doc. 23, ¶¶ 24, 61). Prior to the meeting, Starner informed Yingling of the various problems she had noted with Plaintiff's behavior and performance in recent weeks, and speculated that the changes in Plaintiff's behavior may be medically related. (Doc. 21-3, at 39-40; Doc. 21-4, at 15-16, 20, 24-25, 29). Starner and Yingling both expressed concern for Plaintiff's well-being. (Doc. 21-4, at 30; Doc. 23, ¶ 43). Once the meeting began, Plaintiff reiterated that she struggled to legibly write schedules into the appointment book. (Doc. 21-1, ¶ 25; Doc. 23, ¶ 25). Plaintiff also alleges that she complained to Yingling that Starner inquired about Plaintiff's use of medications, to which Yingling responded that it was inappropriate for Starner to discuss an employee's medications.  (Doc. 21-4, at 34-35, 37-38; Doc. 23, ¶¶ 18, 39). Yingling proposed a number of corrective actions and tools to help Plaintiff better perform her job, including creating an excel list of the Center's customers in an enlarged font, setting up a closed circuit TV at Plaintiff's station to enlarge printed font, and having Plaintiff initially write appointment information on a separate piece of paper and then carefully copying that information into the appointment book. (Doc. 21-1, ¶¶ 26-28; Doc. 21-2, at 51; Doc. 21-3, at 51-52; Doc. 21-4, at 21-22; Doc. 23, ¶¶ 26-28). Although Plaintiff, Starner, and Yingling also discussed Sharepoint as one of the tools that could be helpful to Plaintiff, Yingling admitted in his deposition testimony that he was skeptical that Plaintiff would be able to use

---

minutes, Plaintiff points out that Starner's notes taken after the meeting indicate that she planned to look into whether to grant Plaintiff time off but do not state whether she decided to grant the request. (Doc. 21-2, at 49; Doc. 21-3, at 36-37; Doc. 23, ¶ 79).

Sharepoint effectively because she struggled to record client pickup information using a simple pen and paper. (Doc. 21-2, at 51; Doc. 21-4, at 23-25; Doc. 23, ¶¶ 54-55). Ultimately, Plaintiff was never provided any assistance or training on the use of Sharepoint. (Doc. 21-2, at 9, 15-16, 25; Doc. 21-3, at 48; Doc. 23, ¶¶ 82-83). Yingling states that he hoped the action plan developed would improve Plaintiff's performance, but by the following week he had determined that thes measures were unsuccessful and concluded that Plaintiff's continued employment with the Center was no longer tenable. (Doc. 21-4, at 23; Doc. 23, ¶ 56).

After he heard of the meeting from Plaintiff that night, Robert Phillips called Yingling to discuss Plaintiff's situation. (Doc. 21-4, at 32-34). Phillips states that he informed Yingling that Plaintiff was bipolar during this phone call. (Doc. 21-4, at 34; Doc. 23, ¶ 46). Yingling made no effort to determine whether any additional accommodations were needed to provide for Plaintiff's bipolar condition after the call from Phillips, however, because Plaintiff did not personally inform him that she needed further accommodations. (Doc. 21-4, at 39-41; Doc. 23, ¶ 49).

Plaintiff's job situation continued to deteriorate between her first meeting with Yingling and Starner and their second meeting one week later on April 29, 2013. (Doc. 21-4, at 22, 36). Also on April 29, 2013, two of Plaintiff's coworkers sent Yingling e-mails expressing concerns about Plaintiff's job performance and support for Starner. (Doc. 21-2, at 52-53; Doc. 21-4, at 55). One of those coworkers gave Plaintiff a pamphlet about becoming a home shopper and encouraged her to seek new employment on the same day that she privately urged Yingling to refer Plaintiff to the personnel committee for termination. (Doc. 21-2, at 12-13, 52-53). Plaintiff

believes that these actions were coordinated through Starner, who purportedly told other workers at the Monroe County office that Plaintiff's job was in jeopardy. (Doc. 21-2, at 12-13).

Two days after the April 29, 2013 meeting, Robert Phillips sent an e-mail to Ott, who was the head of the Center's personnel committee. (Doc. 23-2, at 2-3). In the e-mail, Robert Phillips expressed concern about the meetings Yingling and Starner were conducting, and asked Ott or another personnel committee member to attend future meetings concerning Plaintiff. (Doc. 23-2, at 2-3). Robert Phillips also revealed to Ott that Plaintiff was on medication for her bipolar condition, and attached an article about accommodating bipolar disability in the workplace. (Doc. 23, ¶ 10; Doc. 23-2, at 2-3). There is no evidence in the record to suggest that Ott took any action in response to this e-mail.

On May 2, 2013, the day after the Robert Phillips e-mail to Ott, Starner submitted a "personnel issue report" calling for the Center's board of directors to take action against Plaintiff.[3] (Doc. 23-9, at 2-7). Four days later, Yingling submitted his own report to the personnel committee in which he concluded that Plaintiff's employment with the Center should not continue and expressed support for Starner. (Doc. 23-8, at 2-3). Yingling's report did not mention Plaintiff's bipolar condition. (Doc. 23, ¶ 87; Doc. 23-8, at 2-3). In his deposition testimony, Yingling explained that his recommendation to terminate Plaintiff was binding on the personnel committee, as the Center's executive director exclusively held the power to hire and fire employees. (Doc. 21-4, at 42-44, 46-48; Doc. 23, ¶ 50). On May 20, 2013, the personnel

---

[3] It is unclear whether Starner's report was sent to the board of directors or to the personnel committee, as Starner expressed confusion as to their respective roles. (Doc. 21-3, at 49-50).

committee met with Plaintiff and carried out Yingling's directive by offering Plaintiff the option of retirement, resignation, or termination. (Doc. 21-2, at 15; Doc. 21-4, at 47). Neither Starner nor Yingling attended the May 20, 2013 meeting, as Yingling explained that he was worried about personally presenting this ultimatum to the wife of a board member. (Doc. 21-3, at 48; Doc. 21-4, at 47; Doc. 23, ¶¶ 33, 50). Faced with these options, Plaintiff chose retirement and was granted two weeks of severance pay. (Doc. 21-2, at 24, 54).

Plaintiff retained counsel immediately after the events of May 20, 2013, and submitted a letter through counsel on May 22, 2013 demanding that Plaintiff be promptly reinstated. (Doc. 2-2, at 2). Plaintiff's counsel also returned the severance pay that Plaintiff had been provided. (Doc. 21-2, at 25; Doc. 23, ¶ 34). The parties then became locked in a stalemate that has continued to the filing of this action. At one point, a member of the Center's endowment board offered to arbitrate the dispute but the personnel committee essentially rejected the offer, arguing that the endowment board member did not know the relevant facts and lacked the authority to legally bind the Center. (Doc. 21-4, at 49-50, 82). Plaintiff also makes much of the fact that the personnel committee attempted to force Robert Phillips off the Center's board of directors, as the committee believed that he had a conflict of interest given that his wife was threatening legal action against the Center. (Doc. 23-11, at 2; Doc. 23-12, at 2-3; Doc. 23-13, at 2; Doc. 23-14, at 2-3). However, these attempts to remove Robert Phillips from the board ultimately proved unsuccessful, as Phillips remained a board member until resigning the seat on his own accord near the end of his term. (Doc. 23-1, at 18-19, 41-43).

On March 22, 2016, Defendants filed the instant motion for summary judgment (Doc. 21), together with a brief in support thereof (Doc. 22), a statement of material facts (Doc. 21-1),

and a series of exhibits. Plaintiff filed a brief in opposition to Defendants' motion for summary judgment on April 12, 2016 (Doc. 24), along with a response to Defendants' statement of facts (Doc. 23), and her own exhibits. Defendants then filed a reply brief on April 26, 2016. (Doc. 25). Having been fully briefed, this matter is now ripe for disposition.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

## III.   DISCUSSION

Plaintiff asserts ADA and PHRA claims against Defendants under three different theories of liability: (1) discrimination on the basis of disparate treatment; (2) failure to accommodate; and (3) retaliation. (Doc. 1, ¶¶ 46-47, 54, 59). Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims for a variety of reasons. (Doc. 22; Doc.

25). First, Defendants argue that Plaintiff's assertions of disparate treatment, failure to accommodate, and retaliation each fail because Plaintiff has not produced sufficient evidence to create a genuine dispute of material fact. (Doc. 22, at 9-21). Defendants next contend that Starner and Yingling should be granted summary judgment on the basis that there is no individual liability under the ADA and PHRA. (Doc. 22, at 22-23). As a final matter, Defendants argue that Plaintiff's request for punitive damages should be stricken from the complaint in the event that any of her claims survive summary judgment. (Doc. 22, at 22-23). The Court will address each of these arguments in turn.

As a preliminary matter, the Court notes that in general, "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts . . . .")). Because these two statutes are generally coextensive, the Court will address the merits of each claim solely under the ADA. *See Taylor*, 184 F.3d at 306; *Kelly*, 94 F.3d at 105.

### A.   CLAIMS ON THE MERITS

Plaintiff alleges three different theories of liability under the ADA: (1) discrimination on the basis of disparate treatment; (2) failure to accommodate; and (3) retaliation. (Doc. 1, ¶¶ 46-47, 54, 59). Title I of the ADA provides, as a general rule, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is defined as "an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Here, Plaintiff has adduced sufficient evidence that her vision impairment and bipolar condition substantially limit one or more major life activities. Indeed, Plaintiff states that she is entirely blind in one eye and has limited vision in the other, which substantially limits her ability to see and read. (Doc. 21-2, at 4; Doc. 23, ¶¶ 5, 37, 101; Doc. 23-5, at 2). Plaintiff also states that her bipolar condition can cause her severe depression. (Doc. 21-2, at 6-8); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 302 (3d Cir. 1999) (finding that a factual issue existed as to whether the plaintiff's bipolar disorder substantially limited her in the major life activity of thinking even when she was taking lithium); *Stewart v. Bally Total Fitness*, No. CIV. A. 99-3555, 2000 WL 1006936, at *5 (E.D. Pa. July 20, 2000) (finding that a reasonable jury could conclude that a plaintiff's chronic bipolar condition substantially limits major life activities such as sleeping and working). Defendants do not dispute the severity of these

impairments. Accordingly, the Court concludes that Plaintiff is disabled for the purposes of the ADA.[4] *See* 42 U.S.C. § 12102(1).

The ADA prohibits several different types of conduct. *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009) ("Title I enumerates specific examples of conduct that would constitute discrimination prohibited under the statute."). Here, Plaintiff alleges three different theories of liability that implicate the ADA's prohibitions against discrimination on the basis of disparate treatment, failing to make reasonable accommodations, and retaliation. (Doc. 1, ¶¶ 46-47, 54, 59).

### 1. Disparate treatment

Plaintiff first alleges that Defendants discriminated against her on the basis of her vision impairment and bipolar disorder. (Doc. 1, ¶¶ 42, 47, 54; Doc. 24, at 11). "In order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination.'" *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). Federal courts apply the *McDonnell Douglas* burden-shifting framework to assess ADA disparate treatment claims. *Shaner*, 204 F.3d at 500

---

[4] Plaintiff also argues that she was "regarded as" disabled. (Doc. 24, at 14); *see also* 42 U.S.C. § 12102(1)(C). However, Plaintiff does not point to evidence in the record to explain how Plaintiff was purportedly treated differently because of her perceived disability. *See* 42 U.S.C. § 12102(3)(A).

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).   Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the alleged discriminatory action. *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant manages to rebut the plaintiff's *prima facie* case, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Shaner*, 204 F.3d at 500 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). Defendants argue that Plaintiff's disparate treatment theory of liability fails because she has not established a *prima facie* case and also because she has not shown that Defendants' nondiscriminatory reasons for the adverse employment action were pretextual. (Doc. 22, at 11 n.2, 13-16).

### a.   *Prima facie* case of discrimination

Defendants first contend that Plaintiff has not proven her *prima facie* case of discrimination. (Doc. 22, at 11 n.2). Namely, Defendants argue that Plaintiff fails to establish the second and third elements of the *prima facie* case. (Doc. 22, at 11 n.2). It is clear that the first element of the *prima facie* case is satisfied because there is no dispute that Plaintiff is a disabled person within the meaning of the ADA, as noted above.

Turning to the second element, Defendants fleetingly assert that Plaintiff has not shown that she was otherwise qualified to perform the receptionist position at the Center. (Doc. 22, at 11 n.2). However, Plaintiff rebuts this assertion in her brief in opposition to the motion to dismiss by pointing out that she had been employed in that same position for ten years prior to

her termination and that she had multiple prior performance evaluations that rated her work as satisfactory or exceeding expectations. (Doc. 24, at 12 n.1 (citing Doc. 23-10, at 2-5)). The Court finds that the evidence presented by Plaintiff is sufficient for a reasonable juror to conclude that she is otherwise qualified to perform the essential functions of her former job. *See Shaner*, 204 F.3d at 500. The second element of the *prima facie* case of discrimination is thus also satisfied.

As for the third element of the *prima facie* case, Defendants argue that Plaintiff fails to demonstrate a causal connection between the alleged discrimination and the adverse employment action taken against her. (Doc. 22, at 11 n.2). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Plaintiff clearly suffered an adverse employment action here, as Defendants brought about the termination of Plaintiff's employment, even if they technically gave her the option of retirement in lieu of firing. (Doc. 21-2, at 15, 24, 54; Doc. 21-4, at 47). Beyond this, Plaintiff must show that her "disability was a 'determinative factor' in [Defendants'] decision to terminate h[er] employment." *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 214–15 (3d Cir. 2000)). The "burden of establishing [the causation element] of a prima facie case of disparate treatment is not onerous." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). In viewing the evidence presented in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Plaintiff presents

- 16 -

sufficient circumstantial evidence that could lead a reasonable juror to conclude that her termination was a result of discrimination. This evidence includes: the comments allegedly made by Starner in referring to Plaintiff as "Ms. Visually Impaired" and telling Plaintiff that her medications needed to be checked (Doc. 21-2, at 11-12; Doc. 21-4, at 38; Doc. 23, ¶¶ 18, 39, 115-16); the close temporal proximity between the phone call where Robert Phillips informed Yingling that Plaintiff was bipolar and Yingling's decision to end Plaintiff's employment (Doc. 21-4, at 23, 32-34; Doc. 23, ¶¶ 46, 56); and the fact that Yingling held the sole authority to terminate Plaintiff's employment and appears to have been heavily influenced by Starner in making this decision (Doc. 21-2, at 12-13, 52-53; Doc. 21-4, at 55; Doc. 23-9, at 2-7; Doc. 24, at 11). Accordingly, Plaintiff has presented sufficient evidence to preclude summary judgment as to the third prong of the *prima facie* case.

The Court therefore concludes that Plaintiff satisfied her initial burden of making out a *prima facie* case of discrimination.

b. <u>Defendants' legitimate nondiscriminatory reasons for termination</u>

Having concluded that Plaintiff has established a *prima facie* case of discrimination, the burden now shifts to Defendants to proffer a legitimate nondiscriminatory reason for Plaintiff's termination. *See McDonnell Douglas*, 411 U.S. at 802. Again, the burden at this stage is "relatively light," as a defendant need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Here, Defendants offer Plaintiff's poor work performance and behavior as legitimate nondiscriminatory reasons for her termination. (Doc. 22, at 11-13). There is ample evidence in the record to support these

proffered reasons, as Plaintiff freely admits that the quality of her work declined in the spring of 2013, as exemplified by her mishandling of drivers' schedules, ignoring or belatedly responding to requests for appointment changes, failing to forward messages, sleeping at her desk, and illegible handwriting. (Doc. 21-1, ¶¶ 7, 14-16, 20; Doc. 21-3, at 33-34; Doc. 23, ¶¶ 7, 14-16, 20). Plaintiff also concedes that her demeanor was poor during this time period, which caused many of her coworkers to complain. (Doc. 21-1, ¶¶ 11-13, 17-18; Doc. 21-2, at 24; Doc. 21-3, at 39; Doc. 23, ¶¶ 7, 10-13, 17-18).

Accordingly, the Court finds that Defendants have sufficiently articulated legitimate nondiscriminatory reasons for Plaintiff's termination, thereby satisfying their burden under *McDonnell Douglas*.

### c.  Pretext

Because Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to "show by a preponderance of the evidence that [Defendants'] explanation is pretextual." *Fuentes*, 32 F.3d at 763. In order to survive summary judgment at this stage, a plaintiff must produce "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Here, Plaintiff attempts to show pretext under both methods.

### i.  Credibility of Defendants' articulated reasons

Plaintiff first attempts to establish pretext by discrediting Defendants' proffered reasons for her termination. A plaintiff accomplishes this "by demonstrating 'such weaknesses,

implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (quoting *Fuentes,* 32 F.3d at 765). Moreover, it is insufficient for a plaintiff to "simply show that the employer's decision was wrong or mistaken . . . ." *Fuentes,* 32 F.3d at 765). "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action . . . ." *Fuentes,* 32 F.3d at 764.

In the case at bar, Plaintiff fails to discredit Defendants' proffered nondiscriminatory reasons for her termination. Plaintiff primarily alleges that there are inconsistencies in Defendants' testimony regarding Plaintiff's job performance. (Doc. 24, at 12-13). For instance, both Starner and Yingling stated in their deposition testimony that they would have documented any serious concerns with an employee's performance, yet there was no written documentation expressing concerns with Plaintiff's performance until April of 2013. (Doc. 21-3, at 25-29, 52-53; Doc. 21-4, at 56; Doc. 23, ¶¶ 51, 68-70, 85). Plaintiff claims that the absence of previous documentation concerning Plaintiff's performance is inconsistent with Starner's deposition testimony that Plaintiff had always been a poor employee. (Doc. 24, at 12-13). However, the Court finds that this alleged inconsistency is overstated. Indeed, Starner referred to Plaintiff's job performance prior to the spring of 2013 as "marginally acceptable," but there is no evidence in the record to suggest that there was any particular serious concern about Plaintiff's performance prior to April of 2013 that warranted documentation. (Doc. 23, ¶¶ 74,

88; Doc. 21-3, at 34). Furthermore, Plaintiff readily admits that her job performance was worse in the spring of 2013 than it had been previously. (Doc. 21-1, ¶¶ 7, 14-16, 20; Doc. 21-3, at 33-34; Doc. 23, ¶¶ 7, 14-16, 20). The fact that Starner considered Plaintiff's prior job performance to be mediocre but did not formally document any concerns simply does not discredit Defendants' decision to take adverse employment action in the spring of 2013 when Plaintiff's performance became much worse.

Plaintiff additionally notes that the e-mails from coworkers complaining of Plaintiff's behavior were not submitted until April 29, 2013, which Plaintiff alleges was a few days *after* Yingling decided to terminate Plaintiff's employment. (Doc. 21-2, at 52-53; Doc. 21-4, at 55; Doc. 24, at 12-13). However, Plaintiff cites to no evidence in the record to prove that Yingling made up his mind to end Plaintiff's employment prior to April 29, 2013. Indeed, Yingling merely states in his deposition testimony that he decided "[p]robably within a week" of the April 22, 2013 meeting that Plaintiff's employment at the Center should come to an end. (Doc. 21-4, at 23). This statement is insufficient to establish that Yingling had already decided to terminate Plaintiff before the e-mails from Plaintiff's coworkers were received. Moreover, even in the event that Yingling had decided to terminate Plaintiff before receiving the coworkers' e-mails, Defendants do not rely on those e-mails as the basis for Plaintiff's termination. Indeed, it appears that Yingling had ample grounds to terminate Plaintiff based on Starner's observations and multiple meetings with Plaintiff in April of 2013 to discuss the problems with Plaintiff's work performance, and the continued lack of progress thereafter. Further, at least one coworker spoke with Yingling in person on or before April 26, 2013 to complain about the negative effect Plaintiff had on the office environment. (Doc. 21-2, at 22; Doc. 21-4, at 55-56). The Court

therefore finds that the timing of the coworker e-mails to Yingling does not raise any inconsistencies or contradictions capable of casting doubt on Defendants' proffered reasons for the termination. *See generally Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1215 (3d Cir. 1988) ("[T]he mere fact that a defendant relies on a *post hoc* [explanation] does not in and of itself create a factual dispute about whether the [explanation] is pretextual.").

As a final matter, Plaintiff points out a contradiction between the deposition testimony of Starner and Yingling. (Doc. 24, at 13). Although, Starner denied in her deposition testimony that she ever commented about Plaintiff's use of medications, Yingling indicated that he spoke with Starner after she admitted asking Plaintiff whether Plaintiff's medications were in order. (Doc. 21-3, at 34-35; Doc. 21-4, at 34-35, 37-39). However, this inconsistency does not call into question Defendants' proffered reasons for Plaintiff's termination, namely, poor behavior and work performance. *See, e.g., Poper v. SCA Americas, Inc.*, No. CIV.A. 10-3201, 2012 WL 3288111, at *14 (E.D. Pa. Aug. 13, 2012) ("Because the alleged inconsistency . . . pertains to no material fact relating to [the defendant's] proffered reason for termination, and does not suggest that the explanation provided was false, this portion of the record is insufficient to establish an inference of pretext."). Indeed, "a single inconsistency does not automatically overcome a legitimate, non-discriminatory reason for termination." *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 820 (E.D. Pa. 2009). Because Plaintiff fails to explain how this lone inconsistency casts doubt on Defendants' proffered reasons for Plaintiff's termination, the Court cannot conclude that Defendants' reasons are pretextual.

Plaintiff therefore fails to discredit Defendants' articulated reasons for her termination.

ii.     Whether discrimination was a motivating cause

Plaintiff alternatively attempts to demonstrate pretext by arguing that discrimination was

more likely than not the underlying cause of her termination. (Doc. 24, at 11). "To show that

discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff

must point to evidence with sufficient probative force that could allow a factfinder to conclude

by a preponderance of the evidence that the protected characteristic was a motivating or

determinative factor in the employment decision." *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566

F. Supp. 2d 405, 440 (W.D. Pa. 2008). A plaintiff can demonstrate that discrimination was the

likely reason for an adverse action by producing evidence that: "(1) . . . the employer has

previously discriminated against the plaintiff, (2) . . . the employer has discriminated against

other people within the plaintiff's protected class or within another protected class, or (3) . . . the

employer has treated more favorably similarly situated persons not within the protected class."

*Johnson*, 566 F. Supp. 2d at 440 (*citing Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639,

645 (3d Cir. 1998)). Here, Plaintiff does not present any evidence that Defendants discriminated

against other people within her protected class or that Defendants provided favorable treatment

to other employees outside of her protected class.

Plaintiff primarily argues that discrimination was at the root of her termination because

Defendants' proffered reasons of a poor attitude and work performance were *caused by* her

bipolar condition. (Doc. 24, at 11). This argument is unavailing, however, because the ADA

"does not prevent an employer from discharging an employee for misconduct, even if that

misconduct is related to h[er] disability." *Fullman v. Henderson*, 146 F. Supp. 2d 688, 699 (E.D.

Pa. 2001), *aff'd*, 29 F. App'x 100 (3d Cir. 2002) (table); *see also Brown v. Lucky Stores, Inc.,* 246

- 22 -

F.3d 1182, 1187 (9th Cir. 2001) (concluding ADA does not prevent an employer from discharging an employee suffering from alcoholism where that employee drives under the influence of alcohol); *Pernice v. City of Chicago,* 237 F.3d 783, 785 (7th Cir. 2001) (finding that ADA does not prevent employer from dismissing drug-addicted employee who is arrested for possession of drugs); *Jones v. American Postal Workers Union,* 192 F.3d 417, 429 (4th Cir. 1999) (holding that ADA is not violated when postal service terminated employee for threatening a supervisor, even though employee's behavior was allegedly triggered by schizophrenia and post-traumatic stress syndrome); *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (holding that a plaintiff cannot maintain an ADA claim on the ground that post-traumatic stress disorder caused outbursts towards coworkers because "the ADA does not insulate emotional or violent outbursts blamed on an impairment"). Thus, "even accepting [P]laintiff's argument that [Defendants] knew of [P]laintiff's disability and that [Defendants] knew [P]laintiff's conduct was related to his disability, [P]laintiff's evidence is insufficient to show discrimination under the ADA." *Willis v. Norristown Area Sch. Dist.*, 2 F. Supp. 3d 597, 605–06 (E.D. Pa. 2014). Because Plaintiff does not dispute that her conduct and job performance during the spring of 2013 were poor, she cannot establish discrimination merely by showing that her poor performance and attitude were caused by her bipolar condition.

Although not explicitly referenced by Plaintiff as evidence of previous discrimination against her, the Court also considers Starner's alleged comment that Plaintiff may need to check her medications. (Doc. 21-4, at 38; Doc. 23, ¶¶ 18, 39, 116; Doc. 24, at 13). "The Third Circuit generally considers three factors when determining whether stray remarks are probative of discrimination: (1) the relationship of the speaker to the employee and within the corporate

hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Sewell v. Hertrich Investments, LTD*, 825 F. Supp. 2d 503, 515 (D. Del. 2011) (quotation omitted). However, "[s]tray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Here, Starner was Plaintiff's direct supervisor but lacked authority to fire Plaintiff. (Doc. 21-1, ¶¶ 2, 4; Doc. 21-4, at 42-44, 46-48; Doc. 23, ¶¶ 2, 4, 50). The first factor thus neither weighs in favor nor against a finding of discriminatory intent. *See, e.g.*, *Sewell*, 825 F. Supp. 2d at 515 (finding that racist remarks allegedly made by direct supervisor were not dispositive to proving discriminatory animus where supervisor did not make decision to terminate plaintiff). More importantly, Plaintiff fails to link Starner's comment to her own termination. *See Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1111–12 (3d Cir. 1997) (finding that supervisor's alleged ageist comment made four-to-five months before plaintiff's discharge and in an unrelated context to plaintiff's termination was insufficient to show pretext). Plaintiff does not specify when the comment was purportedly made, so the Court cannot presume that Starner's comment came in close proximity to Plaintiff's termination. *See, e.g., Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 610 (E.D. Pa. 2001) (finding that alleged racist comment did not create genuine issue of fact with regard to pretext where "there is no evidence whatsoever that these comments were linked, temporally or otherwise, to the decision to fire Plaintiff"). Likewise, Plaintiff does not provide context to shed light on the purpose of Starner's comment. *See, e.g., Sewell*, 825 F. Supp. 2d at 517 (finding that supervisor's remark telling hearing-impaired plaintiff to "turn it up, turn it up" in reference to plaintiff's hearing aid

was made for a legitimate reason, even if perhaps inconsiderate). Given the absence of evidence that Starner's comment was probative of discriminatory intent, this stray remark is insufficient to prove, by a preponderance of the evidence, that Plaintiff's disabilities were a determinative or motivating cause of her termination.

In viewing the record as a whole and considering Plaintiff's own admission that her job performance and demeanor were poor during the spring of 2013, the Court finds that Plaintiff fails to carry her burden of demonstrating that Defendants' proffered nondiscriminatory reasons for Plaintiff's termination are pretextual. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's ADA and PHRA claims asserted under the theory of disparate treatment.

### 2.  Failure to accommodate

Plaintiff next alleges that Defendants are liable under the ADA for failing to accommodate her disabilities. (Doc. 1, ¶¶ 37, 46-47; Doc. 24, at 13-14). "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Specifically, the ADA construes "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ." 42 U.S.C. § 12112(b)(5)(A). In order to establish a *prima facie* claim for failure to accommodate under the ADA, a plaintiff must prove: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or

without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination[,] which in this context includes refusing to make reasonable accommodations for a plaintiff's disabilities." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009) (quotations omitted). In the case at bar, the Court has already found that Plaintiff was disabled within the meaning of the ADA and that she was otherwise qualified to perform the essential functions of her job at the center. Plaintiff's failure-to-accommodate claim thus turns on the third element: whether Defendants refused to make reasonable accommodations. *See Hohider*, 574 F.3d at 186.

"In handling a disabled employee's request for a reasonable accommodation, 'both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" *Hohider*, 574 F.3d at 187 (quoting *Taylor*, 184 F.3d at 312). The plaintiff bears the initial burden of identifying a possible accommodation and showing that the cost of the accommodation does not clearly exceed its benefits.[5] *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 284 (3d Cir. 2001); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580–81 (3d Cir. 1998); *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 431 (E.D. Pa. 2012); *O'Donnell v. Pennsylvania Dep't of Corr.*, 790 F. Supp. 2d 289, 301 (M.D. Pa. 2011), *aff'd*, 507 F. App'x 123 (3d Cir. 2012) (not precedential). Thus, "district courts [may] grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 670

---

[5] The costs of an accommodation include both financial costs and the administrative burden of implementation. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998).

(3d Cir. 1999) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)). If a plaintiff satisfies her initial burden, the burden then shifts to the employer to prove, as an affirmative defense, that "the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).

Alternatively, Plaintiff can establish the final element of a failure-to-accommodate claim by showing that Defendants failed to engage in the interactive process. *See Willis v. Norristown Area Sch. Dist.*, 2 F. Supp. 3d 597, 606 (E.D. Pa. 2014); *Decker*, 871 F. Supp. 2d at 431 n.17. "The ADA's regulations state that: 'To determine the appropriate reasonable accommodation it may be necessary for the employer to initiate an informal, interactive process with the employee in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'" *Taylor*, 184 F.3d at 311 (quoting 29 C.F.R. § 1630.2(o)(3)). A plaintiff establishes that her employer violated its duty to engage in the interactive process by showing that:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor*, 184 F.3d at 319–20.

 Here, Plaintiff asserts that Defendants failed to accommodate her request to implement and train her in the Sharepoint software program. (Doc. 24, at 13). Additionally, Plaintiff claims that Defendants failed to engage in the interactive process altogether with respect to her bipolar condition. (Doc. 24, at 13-14).

a. Sharepoint

During her April 15, 2013 meeting with Starner to discuss her recent job performance and behavior, Plaintiff asked to be trained in the use of Sharepoint for scheduling driver pickups in response to Starner's complaints that Plaintiff's handwriting was poor and that she frequently made scheduling errors. (Doc. 21-2, at 9-10, 15-16, 19-20, 25; Doc. 23, ¶¶ 81, 111-12). Defendants concede that Plaintiff never received Sharepoint training, but nonetheless argue that Sharepoint would not have assisted Plaintiff in performing the functions of her position. (Doc. 21-1, ¶¶ 29-30; Doc. 21-3, at 47-48; Doc. 22, at 19).

The Court finds that Plaintiff satisfies her initial burden of identifying Sharepoint as a proposed accommodation and demonstrating that Sharepoint's costs are not clearly disproportionate to its potential benefits. *See Skerski*, 257 F.3d at 284 (3d Cir. 2001). Indeed, Plaintiff notes that Sharepoint had previously been implemented at the Center's Lehigh Valley location, so it reasonably follows that the Center could have implemented the same program in the Monroe County office and trained Plaintiff in its use without incurring excessive costs or burdens. (Doc. 21-2, at 9-10, 20; Doc. 21-3, at 45; Doc. 23, ¶ 112). There is also evidence that Sharepoint would have been helpful to Plaintiff because it could have eliminated the need for Plaintiff to write out drivers' schedules by hand, as Plaintiff's illegible handwriting was one of Starner's biggest complaints about her work. (Doc. 21-1, ¶¶ 20, 25; Doc. 21-2, at 9-10, 15-16, 49-50; Doc. 21-3, at 47-48). Plaintiff also stated in her deposition testimony that Sharepoint would have greatly simplified the ride scheduling process, which could have reduced the likelihood of Plaintiff making future scheduling errors. (Doc. 21-1, ¶ 16; Doc. 21-2, at 9-10, 49-50). Although primarily considered to be an accommodation for her vision loss, Plaintiff states

that Sharepoint also would have helped her bipolar condition by simplifying her work. (Doc. 21-2, at 18-19). Accordingly, the Court finds that Plaintiff has made a *prima facie* showing that Defendants failed to accommodate her request to have access to and be trained in the use of Sharepoint.

In order to be entitled to summary judgment, Defendants thus must prove that Plaintiff's request for Sharepoint access and training is either unreasonable or would have created an undue hardship for the Center. *See Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999). Defendants argue that Sharepoint was an unreasonable accommodation because it would not have permitted Plaintiff to perform her essential job functions. (Doc. 22, at 19; Doc. 25, at 10); *see also* 29 C.F.R. § 1630, App. § 1630.9(a) ("[A]n accommodation made to assist an employee with a disability in the performance of his or her job must be adequate to enable the individual to perform the essential functions of the relevant position."). Specifically, Defendants allege that Sharepoint was used for scheduling, but the major problems with Plaintiff's job performance involved data input as opposed to scheduling. (Doc. 22, at 19 (citing Doc. 21-1, ¶¶ 29-30)). Defendants thus contend that Sharepoint would not have enabled Plaintiff to perform her essential job function of data input. (Doc. 25, at 10). The Court finds this supposed distinction between data input and scheduling to be less than clear. Indeed, Defendants do not specify any essential data input tasks that Plaintiff performed deficiently and that would not have been improved if Plaintiff was given full access to and trained in the use of Sharepoint. Thus, there exists a dispute of material fact as to whether Sharepoint constituted a reasonable accommodation that would have enabled Plaintiff to perform her essential job functions. *See O'Donnell v. Pennsylvania Dep't of Corr.*, 790 F. Supp. 2d 289, 302 (M.D. Pa. 2011)

("[I]n general, 'the question of whether a proposed accommodation is reasonable is a question of fact.'" (quoting *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 n. 4 (3d Cir. 2006))).

Defendants alternatively argue in their reply brief that Plaintiff rejected other reasonable accommodations that were offered instead of Sharepoint. (Doc. 25, at 10-11). "[A]n employee cannot make h[er] employer provide a specific accommodation if another reasonable accommodation is instead provided . . . ." *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012) (quoting *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir.1996)). Indeed, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § 1630, App. § 1630.9(a). Here, Defendants argue that Plaintiff failed to use the closed circuit TV text magnification system that was set up after the April 22, 2013 meeting with Starner and Yingling. (Doc. 25, at 10-11 (citing Doc. 21-1, ¶¶ 26-27)). This argument is unavailing because a dispute of fact exists as to whether the closed circuit TV system was a reasonable accommodation. Defendants provide no explanation as to how the closed circuit TV system would have improved Plaintiff's handwriting or allowed Plaintiff to perform other essential job functions such as data input. A reasonable juror could potentially find that Sharepoint's potential to streamline the various tasks inherent to Plaintiff's job made it possible for her to perform the essential functions of her position whereas the more limited functionality of a closed circuit TV would not have allowed Plaintiff to perform all essential functions of her position and thus was not a reasonable

accommodation.[6] *See Solomon*, 882 F. Supp. 2d at 780 (denying summary judgment where there was an issue of fact as to whether defendant's proffered alternative accommodations were sufficient to allow plaintiff to perform the essential functions of her position).

Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's claim that Defendants failed to accommodate her request for access to and training in the use of Sharepoint.[7]

b.   Failure to engage in the interactive process

The Court next turns to Plaintiff's claim that Defendants failed to engage in the interactive process. Plaintiff alleges that Defendants never offered any accommodations to Plaintiff after the May 1, 2013 Robert Phillips e-mail and attached article informing the Center of Plaintiff's bipolar condition and discussing workplace accommodations for employees with bipolar disability. (Doc. 23-2, at 2-3; Doc. 24, at 13-14). Plaintiff contends that this e-mail

---

[6] Furthermore, Defendants appear to have waived their argument that Plaintiff rejected an alternative reasonable accommodation by failing to include the argument in their initial brief in support of their motion for summary judgment. *See Mascantonio v. SWEPI LP*, 195 F. Supp. 3d 667, 693 (M.D. Pa. 2016) ("A party generally may not raise an affirmative defense for the first time in a reply brief at the Rule 56 stage.")

[7] Plaintiff also briefly mentions that Starner denied her request for vacation time as further evidence that Defendants failed to provide reasonable accommodations. (Doc. 24, at 14). To the extent that Plaintiff argues that this incident constitutes another reasonable accommodation request that was denied by Defendants, her assertion fails. First, there is no evidence that Plaintiff presented her request for vacation time as a request for an accommodation, and Plaintiff likewise makes no effort to explain how a two-week vacation would have allowed her to perform the essential functions of her position thereafter. Moreover, Plaintiff admits that despite Starner's initial hesitation, Starner granted Plaintiff permission to take the vacation. (Doc. 21-1, ¶ 23; Doc. 21-2, at 10, 49; Doc. 21-3, at 36-37; Doc. 23, ¶¶ 23, 114).Therefore, even in the event that a two-week vacation could be construed as a reasonable accommodation request, Plaintiff's claim still must fail because she was never denied this accommodation.

should have been sufficient to put Plaintiff on notice of the need to engage in the interactive process. (Doc. 24, at 14). "In handling a disabled employee's request for a reasonable accommodation, 'both parties . . . have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 187 (3d Cir. 2009) (quoting *Taylor*, 184 F.3d at 312). However, "an employee 'must make clear that . . . he/she wants assistance for his or her disability' in order to trigger an employer's duty to engage in the interactive process." *Willis v. Norristown Area Sch. Dist.*, 2 F. Supp. 3d 597, 608 (E.D. Pa. 2014) (quoting *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003)).

Defendants contend that Robert Phillips' e-mail failed to trigger the interactive process with regard to accommodations for Plaintiff's bipolar condition. (Doc. 22, at 19; Doc. 25, at 8-9). "What information the employee's initial notice must include depends on what the employer knows." *Taylor*, 184 F.3d at 313. Thus, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor*, 184 F.3d at 313. Here, Plaintiff has established that Robert Phillips conveyed notice of his wife's bipolar condition, but it is considerably less clear whether Phillips expressed a desire for an accommodation. (Doc. 25, at 8-9). In his e-mail, Robert Phillips states that: (1) Plaintiff has been taking medications for her bipolar condition; (2) Plaintiff's depression has been under control; (3) certain situations can cause Plaintiff to become severely depressed; and (4) he was attaching an article concerning bipolar disability in the workplace. (Doc. 23-2, at 2-3). Importantly, the actual contents of the article is not included in the record and there is no

indication that the article related to Plaintiff's own particularized need or desire for an accommodation. Furthermore, Robert Phillips' statements that Plaintiff was taking medication and that her depression was under control could have led Defendants to reasonably believe that no specific accommodation was needed for Plaintiff's bipolar condition. *See Willis,* 2 F. Supp. 3d at 609 (holding that plaintiff failed to make clear that he wanted assistance for his disability where he assured employer that he was now taking medications after his alleged misconduct, even if employer knew that plaintiff's misconduct was related to his disability). *See generally Taylor v. Principal Fin. Grp., Inc.,* 93 F.3d 155, 164 (5th Cir. 1996) (concluding duty to engage in the interactive process not triggered where employee told employer he was diagnosed with bipolar disorder, and employee requested a reduction in his "objectives" and a lessening of the "pressure"). The Court therefore finds that Plaintiff failed to trigger the interactive process because she did not put Defendants on notice that she desired an accommodation.

Even if the Robert Phillips e-mail had put Defendants on notice that Plaintiff desired an accommodation, this notice came too little, too late. (Doc. 25, at 8-9). By Plaintiff's own assertion, Yingling decided to terminate Plaintiff on or about April 29, 2013. (Doc. 21-4, at 23; Doc. 23, ¶ 56; Doc. 24, at 12-13). Thus, Robert Phillips' May 1, 2013 e-mail purportedly communicating Plaintiff's desire for an accommodation was not sent until after Yingling decided to terminate Plaintiff for her poor work performance and attitude throughout the spring of 2013. This prospective accommodation request does not excuse Plantiff's past misconduct. *See Lassiter v. Children's Hosp. of Phila.,* 131 F. Supp. 3d 331, 351 (E.D. Pa. 2015) ("When an employee requests an accommodation only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late. The ADA does not mandate that

an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability."); *Willis*, 2 F. Supp. 3d at 609 ("Plaintiff did not trigger the interactive process prior to the conduct resulting in his termination, and the [employer] was not required to excuse plaintiff's previous misconduct . . . ."). Accordingly, Plaintiff's assertion that Defendants failed to engage in the interactive process must also fail because Plaintiff did not trigger the interactive process prior to the conduct that resulted in her termination.

### 3. Retaliation

Plaintiff's final theory of liability under the ADA and PHRA is that Defendants retaliated against her for requesting accommodations by terminating her employment and threatening to remove Robert Phillips from the Center's board of directors. (Doc. 1, ¶¶ 56-61; Doc. 24, at 14-15). The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). "To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Once a plaintiff makes out a *prima facie* case, the familiar *McDonnell Douglas* burden-shifting framework applies. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Here, Defendants argue that Plaintiff fails to establish a *prima facie* case of retaliation and that Defendants' stated reasons for her termination were a pretext for retaliation. (Doc. 22, at 20; Doc. 25, at 13-14).

a. _Prima facie_ case of retaliation

Defendants first assert that Plaintiff cannot establish the first and third elements of a _prima facie_ case of retaliation because she has not shown that she engaged in a protected activity or that there was a causal connection between her participation in a protected activity and her termination. (Doc. 22, at 20-21).

i.    Protected employee activity

Plaintiff claims that she twice engaged in protected activity by requesting training in the use of the Sharepoint program as an accommodation for her vision impairment and then again in requesting an accommodation for her bipolar condition. (Doc. 24, at 15). A request for an accommodation in good faith is a protected activity under the ADA. _See Shellenberger v. Summit Bancorp, Inc._, 318 F.3d 183, 190–91 (3d Cir. 2003). Here, there is evidence in the record that Plaintiff made a good-faith request, as an accommodation, to be given access to and trained how to use Sharepoint. (Doc. 21-2, at 9-10, 15-16, 19-20, 25; Doc. 23, ¶¶ 81, 111-12). Furthermore, Defendants implicitly concede in their reply brief that Plaintiff's request to use Sharepoint was a protected employee activity. (Doc. 25, at 13).

On the other hand, Plaintiff's claim that she engaged in a protected activity with respect to her bipolar condition is not nearly as apparent. Plaintiff alleges that her husband Robert Phillips requested an accommodation for Plaintiff's bipolar condition on her behalf via the May 1, 2013 e-mail. (Doc. 24, at 15). However, the Court previously considered this same assertion in reference to Plaintiff's allegation that Defendants failed to engage in the interactive process, and concluded that the e-mail was insufficient to establish that Plaintiff desired an accommodation for her bipolar condition. Given that the May 1, 2013 e-mail does not

constitute a request for an accommodation, Robert Phillips' act of "simply declaring that [Plaintiff] has Bipolar . . . Disorder, or even that [s]he is disabled, without more, is insufficient to constitute a protected activity under the ADA." *Prigge v. Sears Holding Corp.*, No. CIV.A. 09-175, 2010 WL 2731589, at *8 (E.D. Pa. July 9, 2010) (citing *Colwell v. Rite Aid Corp.,* 602 F.3d 495, 506 (3d Cir. 2010); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)), *aff'd*, 432 F. App'x 170 (3d Cir. 2011).

Accordingly, the Court finds that Plaintiff engaged in protected activity, but only as it pertains to her request to be accommodated for her vision impairment by being given access to and training on the use of Sharepoint.

ii.   Adverse action

Defendants do not contest that Plaintiff was subject to adverse action after she sought the Sharepoint accommodation. (Doc. 25, at 13-14). Namely, Plaintiff was terminated from her employment. (Doc. 25, at 13-14). In the context of an ADA retaliation claim, an action is sufficiently adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 447 (E.D. Pa. 2014) (quoting *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. 53, 68 (2006)), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015) (not precedential). Termination from employment would certainly be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination, or from requesting an accommodation.

Plaintiff also appears to contend that Defendants' attempt to remove her husband from the Center's board after her termination constituted additional adverse action. (Doc. 24, at 15). Although Defendants point out conflicting evidence in the record regarding whether

Defendants ever actually threatened to have Robert Phillips removed from the board, it is undisputed that any attempt to remove Phillips from the board was ultimately unsuccessful. (Doc. 21-1, ¶ 32; Doc. 21-2, at 16; Doc. 22, at 20; Doc. 23-1, at 18-19, 41-43; Doc. 23-11, at 2; Doc. 23-12, at 2-3; Doc. 23-13, at 2; Doc. 23-14, at 2-3). Because any threats to remove Phillips from the board did not actually result in Phillips' removal, those threats fall under the category of "trivial harms" that do not rise to the level of adverse action. *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998) ("[M]inor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify as retaliation under the ADA . . . ."); *see also Sconfienza v. Verizon Pa. Inc.,* 307 F. App'x 619, 622, 624 (3d Cir. 2008) (not precedential) (finding that "harsh words that lack real consequences are not" enough to show an adverse action); *Nolan v. Swartz Campbell, LLC*, No. 2:05-CV-1508, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) ("[M]erely experiencing some apprehension and subjectively feeling intimidated from . . . a conversation hardly amounts to the type [of] measures that the courts have found sufficient to support a claim of retaliation.").

Accordingly, the Court finds that Plaintiff produced sufficient evidence to show that Defendants took adverse action against her by terminating her employment. However, Plaintiff's allegation that Defendants threatened to remove Robert Phillips from the Center's board is too minor to constitute adverse action because any attempt to remove Phillips ultimately proved unsuccessful.

iii.    Causation

The third and final element that Plaintiff needs to establish her *prima facie* case of retaliation is a causal connection between her accommodation request and her termination.

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). A causation analysis often, but not exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter,* 435 F.3d 444, 450 (3d Cir. 2006) (internal quotations omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pennsylvania State Univ.*, 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen,* 435 F.3d at 450 (quoting *Krouse,* 126 F.3d at 503-04). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference."). Regardless of the evidence a plaintiff relies on to establish causation, however, a plaintiff must also satisfy an initial gateway requirement by establishing that the defendant knew of the plaintiff's protected activity. *See Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

In the case at bar, Plaintiff expressed her desire to be trained how to use Sharepoint at her April 15, 2013 meeting with Starner. (Doc. 21-2, at 9-10, 15-16, 19-20, 25; Doc. 23, ¶¶ 81, 111-12). Plaintiff reiterated this request to Starner and Yingling at a second meeting a week later. (Doc. 21-2, at 51; Doc. 21-4, at 23-25; Doc. 23, ¶¶ 54-55). Approximately two weeks after her request for an accommodation and one week after the second meeting, Yingling decided that Plaintiff's continued employment at the Center must come to an end. (Doc. 21-4, at 23). However, Plaintiff's employment was not formally terminated until May 20, 2013, a little over a month after Plaintiff's request for an accommodation. (Doc. 21-2, at 15; Doc. 21-4, at 42-44, 46-48; Doc. 23, ¶ 50).

The period between Plaintiff's initial request for Sharepoint training and her termination is beyond the length of time that is generally held to be unusually suggestive of temporal proximity. *See Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (not precedential) ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." (citations omitted)); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive where three weeks elapsed between protected activity and adverse employment action); *Kier v. F. Lackland & Sons, LLC*, No. CIV.A. 14–897, 2014 WL 7192403, at *17 (E.D. Pa. Dec. 17, 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week."); *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) ("[S]ix days is at the long end of what has been held to be unusually suggestive . . . ."). Nonetheless, the relative temporal proximity here could be a factor supporting a finding a causal connection,

when combined with other evidence. *See Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) ("Where the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'" (quotation omitted)); *see also Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003) ("The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation.").

Here, there is sufficient other evidence in the record to infer causation from the intervening period between Plaintiff's request for an accommodation and her termination. For instance, although slightly over a month passed between Plaintiff's request for Sharepoint training and her termination, there was only approximately a one-week gap from the time Yingling found out about the Sharepoint request to when he decided that Plaintiff's employment with the Center needed to come to an end. (Doc. 21-2, at 51; Doc. 21-4, at 23-25; Doc. 23, ¶¶ 54-55). Furthermore, Plaintiff alleges that Starner directed several coworkers to act antagonistically towards Plaintiff during the intervening period, as Starner purportedly told the other workers that Plaintiff's job was in jeopardy. (Doc. 21-2, at 12-13). One coworker even allegedly gave Plaintiff a pamphlet about becoming a home shopper and encouraged her to seek new employment. (Doc. 21-2, at 12-13). Additionally, two coworkers sent Yingling e-mails complaining about Plaintiff's job performance and expressing support for Starner as the office supervisor on the same day as Plaintiff's second meeting with Starner and Yingling. (Doc. 21-2, at 12-13, 52-53; Doc. 21-4, at 55). This circumstantial evidence, combined with the relative temporal proximity between Plaintiff's accommodation request and her termination, is sufficient to establish the necessary inference of causation.

Accordingly, the Court finds that Plaintiff has made out a *prima facie* claim of retaliation against Defendants.

### b.   Defendants' legitimate nondiscriminatory reasons

Because Plaintiff has established a *prima facie* case of retaliation, the burden shifts to Defendants to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). This burden is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the adverse employment action; the defendant need not prove that the articulated reason actually motivated the action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997) (internal quotations omitted). Thus, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003).

As noted above in regard to Plaintiff's ADA discrimination claim, Defendants can offer Plaintiff's poor work performance and behavior as legitimate nonretaliatory reasons for her termination. (Doc. 25, at 13). Indeed, Plaintiff admits that the quality of her work and her overall demeanor were poor during the spring of 2013, as supported by evidence in the record of Plaintiff mishandling of drivers' schedules, ignoring or belatedly responding to requests for appointment changes, failing to forward messages, sleeping at her desk, writing illegibly, and being the subject of coworker complaints about her behavior. (Doc. 21-1, ¶¶ 7, 11-18, 20; Doc. 21-2, at 24; Doc. 21-3, at 33-34, 39; Doc. 23, ¶¶ 7, 10-18, 20). Accordingly, the Court finds that Defendants have easily satisfied their "relatively light" burden under *McDonnell Douglas* of articulating a legitimate nondiscriminatory reason for Plaintiff's termination.

c.   Pretext

Because Defendants have articulated a legitimate, nonretaliatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to show that Defendants' "proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse,* 126 F.3d at 501. In order to survive summary judgment at this stage, a plaintiff "must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Krouse,* 126 F.3d at 501. A plaintiff accomplishes this "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Krouse,* 126 F.3d at 504 (quoting *Fuentes,* 32 F.3d at 765).

The Court's pretext analysis here mirrors the analysis conducted above in regard to Plaintiff's discrimination claim. Again, Plaintiff "'has not presented sufficient evidence to permit a factfinder to either disbelieve [Defendants'] reasons, or to conclude that retaliation was the real reason' for the allegedly improper employment decision[]." *Mercer v. Se. Pennsylvania Transit Auth.*, 26 F. Supp. 3d 432, 447–48 (E.D. Pa. 2014) (quoting *Shaner v. Synthes*, 204 F.3d 494, 502 (3d Cir. 2000)), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015) (not precedential). If anything, it is even less plausible that retaliatory animus (as opposed to discrimination) had a determinative effect on Plaintiff's termination, as Defendants point out that they provided Plaintiff with numerous accommodations over the length of her employment. (Doc. 25, at 13).

Because Plaintiff fails to carry her burden of demonstrating evidence in the record sufficient for a reasonable fact finder to conclude that Defendants' proffered nondiscriminatory reasons for Plaintiff's termination are pretext for retaliation, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's ADA and PHRA claims asserted under the theory of retaliation.

B.  INDIVIDUAL LIABILITY

Defendants argue that there is no individual liability under the ADA and that the ADA and PHRA are coextensive, so therefore Starner and Yingling are entitled to summary judgment on the lone remaining issue of whether Defendants failed to provide a reasonable accommodation. (Doc. 22, at 22-23; Doc. 25, at 2-3). In response, Plaintiff counters that the PHRA extends liability to individual supervisors, even though "[t]he trend within the District Courts of Pennsylvania has been to deny individual liability" with respect to ADA claims. (Doc. 24, at 15).

Turning first to Plaintiff's ADA claim, the Court notes that the relevant statute provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). Title I of the ADA defines a "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). As conceded by Plaintiff, the overwhelming majority of courts within the Third Circuit to have examined the issue have concluded that there is no individual liability

under the ADA.[8] (Doc. 24, at 15); *see also Koslow v. Comm. of Pa.*, 302 F.3d 161, 178 (3d Cir. 2002) ("[T]here appears to be no individual liability for damages under Title I of the ADA . . . ."); *Michalesko v. Freeland Borough*, 18 F. Supp. 3d 609, 626 (M.D. Pa. 2014) ("Any claim against the individual defendants is further barred because the ADA does not impose individual liability."), *aff'd sub nom. Michalesko v. Borough*, 658 F. App'x 105 (3d Cir. 2016) (not precedential); *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 398 (E.D. Pa. 2002) ("[A] growing number of district courts in this Circuit have concluded that there is no individual liability under the ADA, and this appears to be the consensus view."). Given this long line of precedent, the Court finds that Starner and Yingling are not "covered entities" and therefore may not be held individually liable under the ADA.

In regard to Plaintiff's PHRA claim, the Court finds that the issue of individual liability constitutes an exception to the general rule that the ADA and PHRA are interpreted coextensively.[9] Indeed, the PHRA makes it illegal "[f]or any *person*, employer, employment

------

[8] Plaintiff cites a single case, *Doe v. William Shapiro, Esq., P.C.*, which found that an individual supervisor may be liable under the ADA. (Doc. 24, at 15 (citing 852 F. Supp. 1246, 1253 (E.D. Pa. 1994)). However, "*Doe* has been effectively overruled," as the court in *Doe* concluded that individuals may be liable under the ADA upon reasoning that the ADA was analogous to Title VII of the Civil Rights Act of 1964. *Diep v. Southwark Metal Mfg. Co.*, No. CIV. A. 00-6136, 2001 WL 283146, at *2 & n.4 (E.D. Pa. Mar. 19, 2001) (citing *Doe*, 852 F. Supp. at 1252). This reasoning is no longer valid because the Third Circuit subsequently determined that there is no individual liability under Title VII. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996).

[9] Defendants argue that this Court's finding that there is no individual liability under the ADA should dictate the same conclusion with respect to Plaintiff's PHRA claim. (Doc. 22, at 22-23; Doc. 25, at 2-3). However, federal courts within Pennsylvania have consistently drawn a distinction between the ADA and the PHRA on the issue of individual liability. *See Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 441 (E.D. Pa. 2001) ("Unlike Title VII, the

agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . ." 43 Pa. Cons. Stat. § 955(e) (emphasis added). A "person" is defined in the PHRA as "one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees in bankruptcy or receivers." 43 Pa. Cons. Stat. § 954(a). Starner and Yingling are therefore "persons" within the meaning of the PHRA. The relevant issue before the Court thus becomes whether Plaintiff has shown that Starner and Yingling aided, abetted, incited, compelled, or coerced the Center's commission of an unlawful discriminatory practice.

Section § 955(e) limits individual liability to supervisors because only they "can share the discriminatory purpose and intent of the employer that is required for aiding and abetting." *Holocheck*, 385 F. Supp. 2d at 497. Specifically, "an individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren*

---

PHRA provides for individual liability in limited circumstances . . . ."); *see also O'Donnell v. Pa. Dep't of Corr.*, 790 F. Supp. 2d 289, 309 (M.D. Pa. 2011), *aff'd*, 507 F. App'x 123 (3d Cir. 2012) (not precedential); *Holocheck v. Luzerne Cnty. Head Start, Inc.*, 385 F. Supp. 2d 491, 497 (M.D. Pa. 2005). Furthermore, the lone case that Defendants cite in support of their argument, *Michalesko v. Freeland Borough*, does not explicitly hold that the absence of individual liability under the ADA mandates the same conclusion under the PHRA. ((Doc. 22, at 22-23 (citing 18 F. Supp. 3d 609, 626 (M.D. Pa. 2014)). Instead, the court in *Michalesko* found that a plaintiff's PHRA claim must fail where the underlying facts in the court's analysis of the plaintiff's ADA claim established that the plaintiff merely suffered a fleeting mental impairment and thus was not disabled within the meaning of the ADA. *Michalesko*, 18 F. Supp. 3d at 625. Because the court in *Michalesko* found that the plaintiff was not disabled, it never had to consider whether individual liability was possible under the PHRA. *Michalesko*, 18 F. Supp. 3d at 625-26.

*P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998). Here, Plaintiff alleges that Starner and Yingling both held supervisory positions, as Starner managed the Center's Monroe County office and Yingling was the Center's executive director. (Doc. 1, ¶ 29). Moreover, Plaintiff informed each of them of her request for Sharepoint training as an accommodation for her vision impairment. (Doc. 21-2, at 9, 15-16, 25, 48-51; Doc. 21-3, at 48; Doc. 21-4, at 23-25; Doc. 23, ¶¶ 54-55, 81-83, 108-09, 111-12). Because Starner and Yingling knew of Plaintiff's request for Sharepoint training and had the authority as supervisors to act on that request, yet purportedly failed to ensure that Plaintiff received a reasonable accommodation, they may be individually liable under § 955(e). *See, e.g., Balliet v. Scott's Auto Serv., Inc.*, No. 11-CV-05394, 2013 WL 1285474, at *6-8 (E.D. Pa. Mar. 29, 2013) (allowing plaintiff to proceed on PHRA failure-to-accommodate claim as against individual defendant); *see also O'Donnell v. Pennsylvania Dep't of Corr.*, 790 F. Supp. 2d 289, 309 (M.D. Pa. 2011) ("Because Plaintiff appears to be proceeding on a theory that the Individual Defendants aided and abetted conduct that violated the PHRA with respect to Plaintiff; and because we have found there to be disputed issues of fact with respect to Plaintiff's claims regarding the adequacy of the accommodations provided for her disability; we conclude that Defendants have not sustained their burden of demonstrating that they are entitled to summary judgment on Plaintiff's PHRA claims and Defendants' motion for summary judgment will be denied."), *aff'd*, 507 F. App'x 123 (3d Cir. 2012) (not precedential).

Accordingly, this Court grants summary judgment in favor of Starner and Yingling with respect to Plaintiff's ADA claim but finds that Starner and Yingling are not entitled to summary judgment with respect to Plaintiff's PHRA claim.

C. PUNITIVE DAMAGES

As a final matter, the Court considers whether Plaintiff may maintain her claims for compensatory and punitive damages. Defendants state that punitive damages may only be recovered on a discrimination or failure-to-accommodate claim where defendants act with malice or reckless indifference.[10] (Doc. 22, at 21). Plaintiff responds that federal law expressly permits compensatory and punitive damages in regard to discrimination and failure-to-accommodate ADA violations. (Doc. 24, at 15). Indeed, 42 U.S.C. § 1981a(a)(2) provides, in relevant part:

> In an action brought by a complaining party under the powers, remedies, and procedures set forth in . . . the Americans with Disabilities Act of 1990 . . . against a respondent who engaged in unlawful intentional discrimination . . . under . . . section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act [(42 U.S.C. § 12112(b)(5), which requires reasonable accommodation of disabilities)], against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section . . . .

42 U.S.C. § 1981a(a)(2).

However, 42 U.S.C. § 1981a(b)(1) goes on to clarify that punitive damages are recoverable "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual," just as Defendants allege. 42 U.S.C. § 1981a(b)(1); *see also Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002).

---

[10] Defendants also contend that neither compensatory nor punitive damages are available for ADA retaliation claims. (Doc. 22, at 21). However, this issue need not be resolved here because the Court has already concluded that Defendants are entitled to summary judgment on Plaintiff's ADA and PHRA retaliation claims.

Here, Plaintiff does not establish that Defendants acted with malice or reckless indifference in failing to provide her with a reasonable accommodation. As noted above and in Defendants' brief in support of their motion for summary judgment, Defendants provided numerous accommodations for Plaintiff's vision impairment throughout the course of Plaintiff's employment with the Center, even if those accommodations ultimately proved insufficient to allow Plaintiff to perform the essential functions of her job. (Doc. 22, at 22). Simply put, Plaintiff points to no evidence in the record to show that Defendants acted with the requisite state of mind that would support an award of punitive damages.

In contrast to the ADA, the PHRA does not authorize the award of punitive damages whatsoever. *See Klein v. Weidner*, 729 F.3d 280, 289 (3d Cir. 2013); *Hoy v. Angelone*, 720 A.2d 745, 751 (Pa. 1998).

Accordingly, the Court will strike Plaintiff's claim for punitive damages from the complaint because Plaintiff is not entitled to punitive damages on her remaining failure-to-accommodate claim under either the ADA or the PHRA.

## IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' motion for summary judgment (Doc. 21).

An appropriate Order follows.

Dated: March 3, 2017

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**